UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-22508-ALTMAN/Reid

LILLIAM DIEGO,

     *Plaintiff,*

*v.*

MSC CRUISES, S.A.,

     *Defendant.*

_____/

**ORDER**

     Our Plaintiff, Lilliam Diego, was onboard an MSC cruise ship when her foot allegedly "got stuck in a dirty, sticky liquid and/or some other foreign transitory substance," causing her to fall. Amended Complaint [ECF No. 8] ¶ 9. Seeking redress for her injuries, Diego sued MSC, asserting a single claim of negligence.

     After some litigation, MSC has now moved for summary judgment. *See generally* Defendant's Motion for Summary Judgment (the "MSJ") [ECF No. 49]. Diego responded to the MSJ, *see generally* Plaintiff's Response to Defendant's MSJ (the "MSJ Response") [ECF No. 51], and MSC replied, *see generally* Defendant's Reply in Support of MSJ (the "MSJ Reply") [ECF No. 54]. After careful review— and taking the evidence in the light most favorable to Diego—we now **DENY** summary judgment and proceed to trial.

**THE FACTS**[1]

On the afternoon of December 30, 2021, Diego boarded MSC's *Seashore* cruise ship with some friends.[2] *See* Diego's Statement of Material Facts ("SOMF") [ECF No. 52] ¶ 1 ("Plaintiff . . . was a passenger onboard the MSC *Seashore* on December 30, 2021."); Deposition of Lilliam Diego ("Diego Depo.") [ECF No. 50-1] at 12:5–9 ("Who did I cruise with? . . . Friends."); *id.* at 12:19–21 (Q: "Do you remember what time you boarded the ship on the first day of the cruise?" A: "Yes. They asked us to be there by twelve.").[3] Later that evening, Diego and some of her travel companions visited the "cafeteria," or "Marketplace Buffet," on the "16th [deck]," where they were "talking" and "planning what [they were] going to do" for the upcoming "New Year's Eve." *Id.* at 15:16, 16:13–15. Eventually—some time after midnight—they decided to "walk[ ] back to [their] room to go to sleep."

---

[1] "The facts are described in the light most favorable to [the non-moving party]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 n.2 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering MSC's MSJ, then, we describe the facts in the light most favorable to Diego and rely on MSC's Statement of Material Facts ("MSC's SOMF") [ECF No. 50] *only* where Diego has failed to genuinely dispute a proposition MSC has asserted there, *see* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under FED. R. CIV. P. 56 does not apply.").

[2] Because the fall occurred just after midnight, there are some discrepancies in the parties' filings about the date of the incident. We know, however, that the ship departed Miami on December 30, 2021. *See* Deposition of MSC Corporate Representative Jeffrey Ramos ("Ramos Depo.") [ECF No. 51-3] at 51:17–22. (Q: "And so right now we're looking at the cruise itinerary, correct?" A: "That's correct." Q: "Here it says it starts on 12/30/2021 from the Port of Miami, correct?" A: "Yes."). And we know that the fall occurred in the early morning of the *next* day. *See* Deposition of Lilliam Diego ("Diego Depo.") [ECF No. 50-1] at 16:9–17:13 (discussing the period between when she boarded the *Seashore* and her fall). So, we can say with confidence that the fall occurred around 1:00 AM on December 31, 2021.

[3] When citing to any of the depositions, we'll cite to the *transcript* page number as opposed to the *ECF* page number.

2

*Id.* at 16:21–22. As Diego and her friend, Magaly Baluja, "went to get into [an] elevator," Diego's "shoe got stuck because there was something sticky there," and she fell "flat on her face." *Id.* at 15:21–23, 20:7; *see also* Magaly Baluja Affidavit [ECF No. 59-1] at 1 (attesting that Diego "tripped and fell on a sticky substance by the Marketplace Buffet elevators. . . . I personally felt a sticky substance on the floor and was lucky not to trip on it like [Diego] did.").[4] Diego laid still after her fall for several seconds. *See* Diego Depo. at 15:25–16:8 ("I hit my face. I could not move. . . . My teeth rattled. . . . I knew something was broken. I felt it. I could not move. I stayed there. That's all I did. I could not do anything else."). Diego had not seen anything unusual on the floor before she fell. *Id.* at 17:22–18:1 (Q: "Prior to the alleged incident, did you see any sticky substance on the tiles?" A: "Excuse me? You don't see sticky substance. You feel sticky substance. Okay. I did not see anything, no."). Diego doesn't know how or when the floor became sticky. *Id.* at 52:24–55:1 (Q: "Do you know how the floor supposedly became sticky?" A: "No." Q: "Do you know when the floor supposedly became sticky?" A: "No.").

In the seven-second, closed-circuit television ("CCTV") footage,[5] we see Diego and two other women walking across what appears to be a tile-marble floor towards some elevators. *See* CCTV at 0:01; *see also* Diego Depo. at 19:20–22 ("I see myself . . . because I recognize the green pant[s] I believe I had at that time."). Diego was in the lead, and her friend Magaly Baluja was to her left and one step

---

[4] Baluja's affidavit was the subject of some controversy because Diego initially filed it without indicating that it was a sworn statement. *See generally* MSC's Motion to Strike [ECF No. 57]; *see also* July 3, 2023, Paperless Order Denying the Motion to Strike [ECF No. 58]. Diego, however, subsequently refiled Baluja's affidavit with the proper markings. *See* Baluja Affidavit [ECF No. 59-1]. We thus consider this sworn affidavit to be properly in the record.

[5] MSC provided this video to the Clerk of Court. *See* Notice of Filing [ECF No. 41]. When ruling on a motion for summary judgment, we "may consider video surveillance footage when there is no dispute as to the video's accuracy." *Vazquez v. Target Corp.*, 2022 WL 16856249, at *2 (S.D. Fla. Nov. 10, 2022) (Martinez, J.) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). And there is no such dispute here. *See generally* Docket. The video is only seven seconds long because MSC's "general procedure is just to capture the incident—the actual incident that occurred and the time—the time thereafter, but there's no requirement for [MSC personnel] to check the video for anything prior to that." Ramos Depo. at 33:12–16.

behind. *See* CCTV at 0:01; *see also* Diego Depo. at 20:25–21:2 (Q: "[Y]our friend right here; is this your friend with the black jacket?" A: "Yes, that's Magaly."). Suddenly, Diego began to stumble, and she took several stutter-steps before pitching forward onto her face. *See* CCTV at 0:02–03. No floor puddles, stains, or substances are visible in the video. *See generally* CCTV; *see also* Diego Depo. at 20:22–24 ("No, I do not see any sticky substance [in the video]. Like I said, I don't think you can see sticky substances.").

There were no warning placards or wet-floor signs in the elevator lobby. *See* Plaintiff's SOMF ¶ 7 ("There were no warning signs or other notice of the hazardous condition in the Marketplace Buffet area at the time of the Plaintiff's accident."); Diego Depo. at 18:20–25 (noting that there were no "caution cones or caution signs"). There were also no crewmembers present. *See* Diego Depo. at 19:1–3 (noting that there were no "crew members cleaning the elevator lobby"); Baluja Affidavit at 1 ("[T]here was no cruise staff or cleaning personnel in the area."). The only item in the elevator lobby that's of particular interest was a black fan (or a blower) on the floor behind and to the left of Diego and Baluja—which, at the time of the fall, was pointing in their direction (and towards the sticky substance). *See generally* CCTV; *see also* Plaintiff's SOMF ¶ 5 ("The CCTV video footage that captured the Plaintiff's fall depicts a floor dryer on the floor in the area of the Plaintiff's fall."); Deposition of *Seashore* Safety Officer Marco Maresca ("Maresca Depo.")[6] [ECF No. 54-1] at 23:18–24:13. (Q: "What is that?" . . . A: "Blower."). We don't know why this blower was there. *See id.* at 24:7–8 ("I don't know why the blower is there.").[7] But we *do* know that blowers like these are often used to dry floors. *See id.*

---

[6] Marco Maresca is presently a "Staff Captain" for MSC. *See* Maresca Depo. at 5:5–6. He was onboard the *Seashore* on December 31, 2021, and was the "first officer covering the position of safety officer." *Id.* at 5:20–22. "As a safety officer onboard the MSC ship, [he was] in charge of the investigation in case of incident. [He was] in charge for all the firefighting, life-saving, and training of the—all crew members. So it means maintenance of lifeboat, firefighting system. Everything relating to the [Safety-of-Life-at-Sea] requirement." *Id.* at 11:6–11.

[7] Ramos, when asked about the blower, claimed that he "[did not] know what that is." Ramos Depo. at 68:17–21. Although we find this hard to believe, Ramos's denial is irrelevant at summary judgment because "we accept the non-moving party's version of events if the parties disagree about what

at 24:9–13 (Q: "Typically, these blowers are used to dry certain areas that may be wet, though, correct?" . . . A: "Yeah, can—can even use it to—to dry something. Of course, it's a blower."); Ramos Depo. at 44:4–9 (Q: "So if there was a floor fan or a floor dryer, it would be there—in this area is what I'm talking about. If there was a floor fan or floor dryer, it would be for a specific purpose?" . . . A: "That's correct.").

The first crewmember to "help[ ]" Diego after her fall was "a cafeteria person[.]" Diego Depo. at 21:23–25. This individual was "yelling [be]cause he wasn't getting the help that he needed to help [Diego]." *Id.* at 22:21–22. Sometime later, "a female doctor from the ship's hospital" arrived and transported Diego on a gurney—or something like it—to the "hospital or infirmary." *Id.* at 22:8–12; *see also* Ramos Depo. at 14:11–16 (Q: "[Y]ou're also not denying that Ms. Diego sought medical treatment aboard the MSC *Seashore*, correct?" . . . A: "She did receive medical treatment on the ship, correct.").

According to MSC's "Standard Procedures Manual," "[h]ousekeeping manpower is permanently present to the buffet areas landing areas, Guests lift by buffet areas, staircases by buffet areas, during the opening hours." MSC's Standard Procedures Manual—Housekeeping Efficiency [ECF No. 51:5];[8] *see also* Ramos Depo. at 64:16–21 (Q: "[A]ccording to MSC's standard procedure manual, . . . there would be housekeeping personnel permanently present in these locations during the opening hours of the buffet, correct?" . . . A: "That's correct."); Maresca Depo. at 15:7–10 ("The housekeeping personnel is always present in the passenger area. There are a lot of cleaners always in the area of, let's say, buffet, lounge, and so on, of course."); *id.* at 17:1–3 ("[H]ousekeeping is . . .

---

happened." *Moreno v. Wal-Mart Stores E., LP*, 2024 WL 1513457, at *6 (S.D. Fla. Apr. 5, 2024) (Altman, J.) (quoting *Brooks v. Miller*, 78 F.4th 1267, 1271 (11th Cir. 2023)).

[8] Speaking of manpower, the *Seashore* was "fully staffed." *See* Ramos Depo. at 16:7–12. (Q: "So you would consider that the ship was fully staffed?" A: "That's correct." Q: "And when I say 'fully staffed,' I mean, so the same amount of staff would have been in place prior to COVID outbreak a few years back?" A: "Yes, that's correct.").

outside the buffet, in the passenger stairs, everywhere.").[9] And the Marketplace Buffet was open when Diego fell. *See* Diego Depo. at 15:16–18 ("We were in the cafeteria, 16th floor. I don't know if we had coffee or some of the things that they offer at the buffet."); Baluja Affidavit at 1 (noting that the Marketplace Buffet was "open for midnight snacks"); Maresca Depo. at 19:25–20:5 (Q: "Now, as the safety officer who was onboard that day, you understand that the marketplace buffet was open at that time for midnight snack, correct?" . . . A: "Most probably, yes. I don't remember exactly, but most probably, yes.").

All members of the *Seashore*'s crew were required to clean up (or report) any spills they came across. *See* MSC's Standard Procedures Manual—Housekeeping Efficiency ("The Housekeeping Cleaners are aware they should report immediately any cleanliness issue/s to their Supervisor and/or the Housekeeping Manager—ex: drink spill on the floor, vomiting. . . The Housekeeping Cleaners are aware they should take action if they notice any cleaning issue or call for assistance if needed—calling their Supervisor and/or the Housekeeping Manager, if necessary."); Maresca Depo. at 12:16–22 ("[I]n case we found an area that is affected by, I don't know, water on the floor that can be dangerous. We have all the crew member that are working on the ships that they were—that were there to inform the supervisor in order to send somebody to clean, to keep it clear of the area. So all levels are involved. All crew members are involved in—in this case." (errors in original)).

Maresca, as Safety Officer, "conducted the investigation for this incident." *Id.* at 24:15–17; *see also* Ramos Depo. at 20:7–17 ("Once they contacted the safety officer, [the] safety officer then goes on scene to look at the area to determine if there's any defects or things that they could find wrong with the area. After they do that, [the] safety officer obtains a statement from the victim. And once he does that, he confirms what the victim wrote in the statement compared to the area . . . where the

---

[9] For what it's worth, Maresca was "not in charge for the housekeeping department." Maresca Depo. at 17:10–11.

accident occurred. He writes up an incident/accident report, also identifies if there's any witnesses involved. He also obtains any—if there's any applicable videos involved. Also, if there's any photos he needs to take, he also includes that in the report. And then that whole report gets uploaded into our system."). Indeed, Maresca visited the scene of Diego's fall "a few minutes later." Maresca Depo. at 22:17–23. But he did not "interview anybody from housekeeping to see if anything had spilled in that area" beforehand. *Id.* at 36:15–18. Nor did he "interview anybody from housekeeping to see if they had cleaned the area at any time prior to the incident[.]" *Id.* at 36:25–37:6.

Diego remained onboard the *Seashore* for the duration of the cruise. *See* Diego Depo. at 23:4–8 (Q: "Now, MSC's medical team offered to disembark you in Jamaica, correct?" A: "Yes, they did. Yes." Q: "But you refused, correct?" A: "I refused, yes."). After disembarking in Miami, Diego immediately sought medical care. *See id.* at 23:11–15 ("As soon as I got off the ship, my son picked me up and immediately he took me to the urgent care of Leon. Immediately. We went from the port to the hospital, or to the urgent care of the emergency room."). And Diego had indeed sustained injuries from her fall. *See id.* at 23:18–21 ("They did x-rays. They did ultrasound of my head because my face was black and blue. There, they did my arm. They determined, yes, it was broken.").

Diego sued MSC on August 9, 2022. *See* Complaint [ECF No. 1]. She filed her Amended Complaint three days later. MSC answered [ECF No. 13]. And, after mediation failed, *see* Final Mediation Report [ECF No. 30], MSC filed this MSJ on June 12, 2023.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In ruling on a motion for summary judgment, we "need consider only the cited materials, but [we] may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the we must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, we must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, we must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case[.]" *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and

summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

MSC moves for summary judgment on the Amended Complaint's only count. According to MSC, "because there is no genuine issue as to any material fact with regards to the existence of a risk creating condition, that MSC had actual or constructive notice of the alleged risk creating condition, or that an alleged phantom sticky substance proximately caused her fall; and because the Plaintiff lacks expert testimony to show that the alleged condition existed, was in fact hazardous, and did in fact cause her fall, MSC is entitled to summary judgment." MSJ at 3 (cleaned up). We disagree with each of these assertions. As we'll explain below, we find that Diego *has* created a genuine issue of material fact as to whether (1) a sticky substance was on the floor and (2) MSC had actual or constructive notice of the substance's presence.[10] And that's enough for Diego to survive summary judgment.

### I.      Negligence in the maritime context generally

"Federal maritime law applies to actions arising from the alleged torts committed aboard a ship sailing in navigable waters." *Smith v. Royal Caribbean Cruises, Ltd.*, 620 F. App'x 727, 729 (11th Cir. 2015) (cleaned up). "Along with our judicially created body of maritime law, we 'rely on general principles of negligence law' in analyzing a maritime tort case." *Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1336 (11th Cir. 2023) (quoting *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th

---

[10] As far as we can tell, MSC's proximate-cause argument is essentially the same as its no-risk-creating-condition argument. *See* MSJ at 6 (asserting that the "Plaintiff's fall was the result of her own misstep, not a 'risk-creating condition' found on the subject floor"). MSC's causation argument is frivolous. Diego has *explicitly* testified that she "fell forward" after "her shoe got stuck *because there was something sticky.*" Diego Depo. at 15:22–24 (emphasis added). And she has been clear that the fall caused extensive injuries. *See id.* at 23:18–24:14 (discussing her injuries, including a broken elbow). At summary judgment, we must take her at her word. *See Carter v. Butts Cnty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016) ("At [the summary-judgment] stage, the Court accepts the Plaintiffs' version of the facts and draws all justifiable inferences in their favor." (cleaned up)); *Merricks v. Adkisson*, 2014 WL 11380912, at *2 (M.D. Fla. May 22, 2014) (Kovachevich, J.) (noting—at summary judgment—that the court must "tak[e] the Plaintiff at her word").

Cir. 2019)). We thus "rely on state law as a supplement" to federal maritime law—but only so long as state law doesn't "alter or overrule federal maritime law." *Diaz v. Carnival Corp.*, 555 F. Supp. 3d 1302, 1306 (S.D. Fla. 2021) (Torres, Mag. J.). "To prevail on a negligence claim, a plaintiff must show that '(1) the defendant had a duty to protect the plaintiff from a particular injury, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual harm.'" *Guevara*, 920 F.3d at 720 (quoting *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012)).

"With respect to the duty element in a maritime context, 'a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew.'" *Ibid.* (quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)); *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) ("[T]he benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition, at least where, as here, the menace is one commonly encountered on land and not clearly linked to nautical adventure."). "In other words, a cruise ship operator's duty is to shield passengers from known dangers (and from dangers that should be known), whether by eliminating the risk or warning of it. Liability for a cruise ship operator thus hinges on whether it knew or should have known about the condition." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020) (cleaned up). "Actual notice exists when the defendant knows about the dangerous condition, and constructive notice exists where 'the shipowner ought to have known of the peril to its passengers.'" *Newbauer v. Carnival Corp.*, 26 F.4th 931, 935 (11th Cir. 2022) (quoting *Keefe*, 867 F.2d at 1322).

## II.     The presence of the sticky substance

Diego has created a genuine issue of material fact as to whether there was a sticky substance on the floor. *First*, she (under oath) said exactly that. *See* Diego Depo. at 15:21–24 ("We went to get into the elevator. My shoe got stuck because there was something sticky there, and I fell forward."); *id.* at 18:6–11 (Q: "Did your clothes or shoes have any residue of sticky substance on them?" A: "Yes. One of my shoes was stuck on the floor. It came off. So I'm sure there was some sticky substance on it."). *Second*, her friend (Baluja) corroborated her claim. *See* Baluja Affidavit at 1 ("Diego . . . tripped and fell on a sticky substance by the Marketplace Buffet elevators. . . . I personally felt a sticky substance on the floor and was lucky not to trip on it like [Diego] did. . . . Had [anyone from MSC] asked me in that moment I would have told them that the floor was extremely sticky, like if something had spilled and they did a poor job clearing the mess."). *Third*, at the time of the fall, there was a blower—of the kind that's typically used to dry floors—pointing in the direction of the spot where Diego fell. *See generally* CCTV; *see also* Maresca Depo. at 24:9–13 (Q: "Typically, these blowers are used to dry certain areas that may be wet, though, correct?" . . . A: "Yeah, can—can even use it to—to dry something. Of course, it's a blower."); Ramos Depo. at 44:4–9 (Q: "So if there was a floor fan or a floor dryer, it would be there—in this area is what I'm talking about. If there was a floor fan or floor dryer, it would be for a specific purpose?" . . . A: "That's correct.").

Our case is thus on all fours with *Burgess v. Sam's East, Inc.*, 2023 WL 3600605 (S.D. Fla. Apr. 7, 2023) (Moore, J.). The plaintiff there slipped and fell on a "wet slippery concrete surface" as he was emerging from a Sam's Club. *Id.* at *1. The plaintiff sued Sam's Club for negligence, which moved for summary judgment on the basis that "it did not breach its duty to Plaintiff." *Ibid.* Specifically, Sam's Club argued that "video evidence of the incident demonstrates that there was not even any puddle of water in which Plaintiff supposedly slipped." *Id.* at *2 (cleaned up). The court reviewed the video footage—which was apparently of "poor" quality—and could not "conclusively determine whether a

transitory substance existed." *Id.* at *3. Still, Judge Moore correctly found that the plaintiff had created a genuine dispute of material fact on the question of whether the floor was wet because (1) the plaintiff testified that it was and (2) an employee had placed a "Wet Floor" sign "immediately next to the area where the Plaintiff fell." *Ibid.* Our case is even easier. Our Plaintiff has said that she fell because her foot got caught on some sticky substance on the floor. Her friend corroborated this claim. And, sure enough, someone had directed a blower at the spot where the fall occurred.[11] As in *Burgess*, then, we find that Diego has created a genuine dispute of material fact as to whether the floor was sticky.

Against all this, MSC advances three arguments—all unavailing. *First*, MSC says that "[t]he CCTV video footage demonstrates that the subject floor was not covered with a 'dirty, sticky liquid and/or some other foreign transitory substance.'" MSJ at 2. *Second*, MSC claims that Diego "herself has even testified that . . . she did not see a sticky substance prior to falling and . . . she did not feel a sticky substance after falling. . . . Diego further testified that she did not know . . . how the floor got sticky or . . . when the floor got sticky. . . . Finally, upon review of the CCTV video . . . , Diego testified that 'no, I do not see any sticky substance.'" *Ibid.* (cleaned up). *Third*, MSC insists that the "Plaintiff has failed to disclose a single liability expert who could testify that a 'dirty, sticky liquid and/or some other foreign transitory substance,' constituted a risk creating condition, or that the alleged condition caused her fall." MSJ at 6. We address—and reject—each contention in turn.

*First*, the video (we agree with MSC) doesn't show any sticky liquid, puddle, or substance on the floor. But that's irrelevant. If the substance was clear (like so many liquors and sodas), no CCTV

---

[11] We recognize that Baluja is a friend of Diego's and that she was thus hardly a disinterested witness. While this fact may be "fertile ground for cross-examination," *Moreno*, 2024 WL 1513457, at *7, it's irrelevant at summary judgment, *see, e.g.*, *United States v. Stein*, 881 F.3d 853, 856–57 (11th Cir. 2018) (en banc) (noting that "a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment"); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 944 (11th Cir. 2021) ("A non-conclusory affidavit which complies with Rule 56 can create a genuine dispute concerning an issue of material fact, even if it is self-serving and/or uncorroborated." (cleaned up & quoting *Stein*, 881 F.3d at 858–59)).

12

camera would have captured its presence. And, because the cameras don't tell us anything about whether the floor was (or wasn't) sticky, we must take the Plaintiff and her friend at their word. *See, e.g.*, *Moreno*, 2024 WL 1513457, at *8 (allowing a plaintiff's claim to survive summary judgment even though (1) "the Incident Surveillance Video doesn't show the substance clearly" and (2) "we [didn't] see the substance on the ground in the Pre-Incident Surveillance Video"); *Burgess*, 2023 WL 3600605, at *3 (same, even though the court was "unable to conclusively determine [from the video] whether a transitory substance existed on the floor at the time of the fall"); *Hall v. Target Corp.*, 2023 WL 4686093, at *1 (M.D. Fla. July 21, 2023) (Mizelle, J.) (denying the defendant's motion for summary judgment in part, even though "no puddle or spill is clearly visible on the video at any time").

*Second*, we find nothing controversial about Diego's statement that she *didn't* see the sticky substance before she fell. On the contrary, this fact only *helps* her claim because, if she *had* seen it, MSC would have a strong argument that she *should* have avoided it. In any event, slip-and-fall victims rarely (if ever) see the substance before they fall. *See, e.g.*, *Williams v. Carnival Corp.*, 440 F. Supp. 3d 1316, 1321 (S.D. Fla. 2020) (Torres, Mag. J.) (finding that a genuine issue of material fact existed as to the presence of a large puddle the plaintiff "clearly testified she did not see . . . prior to her fall"); *Plott v. NCL Am., LLC*, 786 F. App'x 199, 203 (11th Cir. 2019) (per curiam) (describing a "colorless and odorless puddle" the plaintiff "did not see" before the fall); *Aponte v. Royal Caribbean Cruise Lines Ltd.*, 739 F. App'x 531, 537 (11th Cir. 2018) (per curiam) (noting a "puddle of soap" the plaintiff "did not see"). And MSC's claim that Diego didn't *feel* a sticky substance after she fell is misleading. True, Diego didn't probe (with her hand) the spot where she tripped in search of a foreign substance. *See* Diego Depo. at 18:2–5 (Q: "After the alleged incident did you feel any sticky substance?" A: "After? After, no. I was on the floor."). But Diego *did* say that she felt the substance with her foot *when* she fell. *See id.* at 15:22–23 ("My shoe got stuck because there was something sticky there[.]"). And we're (again) not surprised that Diego didn't know when or how the floor became sticky. And we're not sure why

this should matter to any live issue in the case. Diego, after all, was simply *passing through* the elevator lobby from the cafeteria when she fell—she wasn't standing watch over it. For all we know, some kind of sticky substance spilled on that floor five minutes (or five hours) before Diego's fall. Perhaps we might have more clarity about what happened if MSC had produced more than seven seconds of video. Either way, again, it's not uncommon for slip-and-fall plaintiffs to have no idea when or how the floors they slipped on became dangerous. *See, e.g., Villa v. Carnival Corp.*, 207 F. Supp. 3d 1311, 1314 (S.D. Fla. 2016) (Altonaga, J.) ("But the fact Plaintiff cannot identify the substance he slipped on, how it got there, or how long it was there, does not mean there was no dangerous condition."); *Hostert v. Carnival Corp.*, 2024 WL 68292, at *2 (S.D. Fla. Jan. 5, 2024) (Altman, J.) (denying a cruise operator's motion for summary judgment, despite a slip-and-fall plaintiff not knowing "how long the floor was wet before she slipped on it" or "how it got that wet"); *Haiser v. MSC Cruises (USA) Inc.*, 2019 WL 4693200, at *4 (S.D. Fla. Aug. 9, 2019) (Smith, J.) (denying a cruise operator's motion for summary judgment, even though the plaintiff had "no first-hand knowledge of what caused her to fall").

*Third*, MSC contends that, "[a]ccording to the Southern District of Florida, a plaintiff in a negligence action sounding in the General Maritime Law, who does not have a liability expert, cannot survive summary judgment." MSJ at 6. But this is a misstatement of the law, and the cases MSC cites don't support this proposition. MSC first points to *Price v. Carnival Cruise Lines*, 2022 WL 2713737 (S.D. Fla. July 13, 2022) (Bloom, J.). *See* MSJ at 6–7. In that case, Judge Bloom—granting Carnival's motion for summary judgment—noted that "courts have granted summary judgment in favor of defendants when plaintiffs have failed to present any expert testimony that there was a violation of safety standards or a product defect that created a dangerous condition." *Price*, 2022 WL 2713737, at *7. That's certainly true. But saying that "courts *have* granted summary judgment" when a plaintiff "has failed to present any expert testimony" is not at all the same as saying that courts "*must* grant

summary judgment" in those circumstances. More fundamentally, *Price* involved a plaintiff who had tripped over a "round metal clamp" on the deck, *id.* at *1, and the parties hotly disputed whether the clamp "was dangerous," *id.* at *7.[12] Here, by contrast, we're talking about a "sticky liquid." Amended Complaint ¶ 9. And we don't need an expert witness to tell us something everyone already knows— which is that "liquids" *can* cause falls. *Cf. Hostert*, 2024 WL 68292, at *8 ("*Of course* wet floors are dangerous. That's why [the plaintiff] slipped and fell. That's why all of the plaintiffs in all of the cases we've cited slipped and fell. And it's why [the defendant's] *own procedures* make clear that wet floors are dangerous—and that, as a result, *all crewmembers* have an obligation to clean up wet floors quickly."). Remember, in this respect, that all crewmembers onboard the *Seashore* had an obligation *either* to clean up *or* to report spills on floors. *See* MSC's Standard Procedures Manual—Housekeeping Efficiency ("The Housekeeping Cleaners are aware that they should take action if they notice any cleaning issue or call for assistance if needed[.]"); Ramos Depo. at 57:4–11 (Q: "Didn't you mention earlier that [the hotel cleaners] report whenever they have to do a cleanup or whenever there's a spill?" A: "Well, all crew members do that." Q: "So that is not just the job duty of a hotel cleaner; it's the job duty of anybody; is that what your testimony is?" A: "For reporting any spills that they notice on the floor, correct."). We, in short, reject MSC's suggestion that the law required Diego to hire an expert to tell us something everyone already understands.

---

[12] MSC's reliance on *McClanahan v. NCL (Bahamas) Ltd.*, 281 F. Supp. 3d 1350 (S.D. Fla. 2017) (Otazo-Reyes, Mag. J.), fares no better. *See* MSJ at 7–8. In that case, Magistrate Judge Otazo-Reyes granted the cruise line's motion for summary judgment because the "[p]laintiff ha[d] no expert testimony that the step pattern violates any safety standards[.]" *McClanahan*, 281 F. Supp. 3d at 1354. That's a perfectly reasonable finding in a complicated case involving the very technical details of an allegedly unsafe design—*i.e.*, a "long and short pattern of steps." *Id.* at 1353. But it doesn't purport to establish a novel rule that maritime slip-and-fall plaintiffs *must* have an expert to tell us what we already know—that people often slip and fall on wet and sticky floors.

### III.     Actual or constructive knowledge

A slip-and-fall plaintiff may prove that the defendant had either actual or constructive knowledge. Actual knowledge is easy to understand and can be distilled by the following question: Did the defendant *actually* know about the presence of the sticky substance? Constructive knowledge is a bit more nuanced. But, for our purposes, it suffices to say that a slip-and-fall plaintiff can prove constructive knowledge by adducing circumstantial evidence. So, for instance, "a maritime plaintiff can establish constructive notice with evidence that the defective condition existed for a sufficient period of time to invite corrective measures." *Hodson v. MSC Cruises, S.A.*, 2021 WL 3639752, at *7 (S.D. Fla. Aug. 2, 2021) (Goodman, Mag. J.) (cleaned up), *report and recommendation adopted*, 2021 WL 3634809 (S.D. Fla. Aug. 16, 2021) (Moreno, J.). And that's consistent with Florida law, which makes clear that a slip-and-fall plaintiff may prove constructive knowledge through "circumstantial evidence," showing *either* that "[t]he dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition" *or* that "[t]he condition occurred with regularity and was therefore foreseeable." FLA. STAT. § 768.0755(1).

The Eleventh Circuit has found that a period as short as ten minutes may be sufficient to put a defendant on constructive notice of a dangerous condition. *See Lebron v. Royal Caribbean Cruises Ltd.*, 818 F. App'x 918, 922 (11th Cir. 2020) (reversing directed verdict on issue of constructive notice where the "unsafe condition existed for at least ten minutes"); *see also D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 798 (11th Cir. 2019) (reversing summary judgment and finding that "eighteen minutes was a sufficient period to present a genuine issue of material fact" on the question of constructive notice). A slip-and-fall plaintiff may also "establish constructive notice with evidence of substantially similar incidents in which conditions substantially similar to the occurrence in question must have caused the prior accident." *Guevara*, 920 F.3d at 720 (cleaned up). Or she could show that

16

the defendant's employees were "in the vicinity of where the fall occurred," such that they *should've* known of the dangerous condition. *Plott*, 786 F. App'x at 203 (quoting *Markowitz v. Helen Homes of Kendall Corp.*, 826 So. 2d 256, 261 (Fla. 2002)); *see also Haiser*, 2019 WL 4693200, at *5 (finding that the crewmembers "should have known about the presence of water on floor since they were in the immediate vicinity").

Here, Diego has created a genuine issue of material fact as to whether MSC had actual *or* constructive knowledge of the sticky substance. Starting with actual knowledge, a reasonable jury could find that some MSC employee placed the blower in the area of the fall—pointed in the direction of the sticky substance—because he (or she) knew that something had spilled onto the floor and was doing his (or her) best to comply with company policy and clean it up. Since, at summary judgment, we can make "reasonable inferences" in the non-movant's favor, we can assume that *Seashore* staff wouldn't have placed an unsightly blower next to the elevator lobby for no reason. *See Plott*, 786 F. App'x at 203 ("Drawing all *reasonable inferences* in Plott's favor, as we must, a reasonable factfinder could conclude that those crewmembers knew or should have known about the wet Conservatory floor and should have either removed the hazard or warned Plott of it." (emphasis added)); *Hostert*, 2024 WL 68292, at *7 (finding that facts were "more than sufficient to raise a *reasonable inference* that the water had been there long enough for Carnival to see it" (emphasis added)). In *Burgess*, remember, the employee's decision to place a "wet-floor" sign in the area around where the plaintiff would later fall "demonstrate[d] that [d]efendant may have already known of a hazardous condition, potentially constituting actual notice." 2023 WL 3600605, at *4. And, in *Guevara*, the Eleventh Circuit found that a "cruise ship operator has notice of a condition . . . if a ['watch-your-step'] sign is posted on a ship warning about the condition"—so long as there's a "connection between the warning and the danger." 920 F.3d at 721–22. Just as the courts in *Burgess* and *Guevara* inferred that the crewmembers in those cases had placed warning signs in the areas of the alleged spills as a way of mitigating the dangers those

spills created, we can infer that an MSC crewmember had deployed the blower in an attempt to dry up the wet (or sticky) floor Diego would later fall on.

We also find that Diego has created a genuine issue of material fact on the issue of constructive knowledge. Diego (recall) testified that her "shoe got stuck because there was something *sticky* there, and I fell forward." Diego Depo. at 15:22–24 (emphasis added); *see also id.* at 18:6–11 (Q: "Did your clothes or shoes have any residue of *sticky* substance on them?" A: "Yes. One of my shoes was stuck on the floor. It came off. So I'm sure there was some *sticky* substance on it." (emphasis added)). And Baluja corroborated this account. *See* Baluja Afifdavit at 1 ("Diego . . . tripped and fell on a *sticky* substance by the Marketplace Buffet elevators. . . . I personally felt a *sticky* substance on the floor and was lucky not to trip on it like [Diego] did. . . . Had [anyone from MSC] asked me in that moment I would have told them that the floor was extremely *sticky*, like if something had spilled and they did a poor job clearing the mess." (emphasis added)).

Courts have routinely inferred from a plaintiff's allegation that a puddle was dirty that the puddle had been lingering long enough for the defendant to have had constructive knowledge. *See Palavicini v. Wal-Mart Stores E., LP*, 787 F. App'x 1007, 1012 (11th Cir. 2019) (noting that, in determining *how long* a substance has been sitting on a floor, courts look to several factors, including "evidence of footprints, prior track marks, changes in consistency, [or] drying of the liquid"); *Norman v. DCI Biologicals Dunedin, LLC*, 301 So. 3d 425, 429 (Fla. 2d DCA 2020) (same, but considering whether the "offending liquid" was "dirty" or "scuffed."); *see also, e.g.*, *Woods v. Winn Dixie Stores, Inc.*, 621 So. 2d 710, 711 (Fla. 3d DCA 1993) ("Testimony of dirt, scuffing, or tracks in a substance generates sufficient inferences of constructive notice."); *Winn-Dixie Stores, Inc. v. Guenther*, 395 So. 2d 244, 246 (Fla. 3d DCA 1981) ("Here, testimony that the liquid was dirty and scuffed and had several tracks running through it was, in our opinion, adequate to impute constructive notice of the hazardous

condition to the store manager.").[13] "This can be a fairly low standard." *Williams v. Wal-Mart Stores, Inc.*, 584 F. Supp. 2d 1316, 1319 (M.D. Ala. 2008).

As with dirty or marked spills—whose duration we can reasonably infer from the fact that they've had enough time to become dirty or marked—a sticky substance likewise creates a reasonable inference that the spill was on the floor long enough to provide the cruise operator with constructive knowledge.[14] Spilled liquids only become sticky, after all, once they have sat and dried for some time. Take, for instance, a juice, soda, or beer. When those substances first splash onto the floor, they create a wet puddle—not so different from spilled water. But, after having been left sitting for some time, the water within the juice, soda, or beer evaporates, leaving behind a sticky residue. We don't need an expert witness to explain this phenomenon because it's obvious to most (if not all) jurors. *Cf.* FED. R. EVID. 702(a) ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that the expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence* or to determine a fact in issue" (emphasis added)); *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (noting that "expert testimony [is] unnecessary" for "matters that arguably lie within the understanding of the average lay person"); *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit*,

---

[13] As we explained in a similar case: "It's no surprise that courts often rely on these little nuggets of circumstantial evidence. After all, a customer shopping in a store doesn't tend to notice the puddle before he slips on it. And, even if he had, he'd rarely have occasion to measure the amount of time that elapsed between the substance's appearance on the floor and his encounter with it." *Torres v. Wal-Mart Stores E., L.P.*, 555 F. Supp. 3d 1276, 1283 n.8 (S.D. Fla. 2021) (Altman, J.).

[14] In her Amended Complaint, Diego alleged that her "foot got stuck in a *dirty*, sticky liquid and/or some other foreign transitory substance." Amended Complaint ¶ 9 (emphasis added). But she's adduced no evidence—either through her own testimony or anywhere else—for the proposition that the floor was (in addition to being sticky) dirty. *See generally* Docket. Because a "nonmoving party 'may not rest upon the mere allegations . . . of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial,'" *Kadylak v. Royal Caribbean Cruise, Ltd.*, 167 F. Supp. 3d 1301, 1306 (S.D. Fla. 2016) (Scola, J.) (quoting *Anderson*, 477 U.S. at 248), we cannot consider Diego's unsupported assertion that the substance was "dirty."

50 F.3d 908, 917 (11th Cir. 1995) ("Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves."); *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1320 (11th Cir. 2011) (noting—in the context of products liability—that, when "a condition undoubtedly is within the common experience of a jury[,] expert testimony is unnecessary").

Recall, also, that, "according to MSC's standard procedure manual, there would be housekeeping personnel *permanently* present in these locations [like the elevator lobby] during the opening hours of the buffet," Ramos Depo. at 64:16–21 (emphasis added), and that these "Housekeeping Cleaners [were] aware that they should report immediately any cleanliness issue/s" or "take action," MSC's Standard Procedures Manual—Housekeeping Efficiency. That housekeeping personnel should have been in the area of the fall raises two questions—both of which are sufficient to let the jury decide the degree to which MSC was on constructive notice. *One*, if a member of the housekeeping team *was* in the vicinity of the sticky substance, then why didn't he (or she) clean it up as required? And, if the housekeeping team *wasn't* in the area as they were supposed to be, why weren't they?

In this way, our case is a lot like *Castellanos v. Target Corp.*, 2011 WL 5178334 (S.D. Fla. Oct. 14, 2011) (Cohn, J.). The plaintiff there "slipped on a puddle of liquid bleach and sustained injuries" at a Target. *Id.* at *1. She sued Target for negligence, and Target moved for summary judgment, contending that the plaintiff had "fail[ed] to prove constructive notice." *Id.* at *1, *3. The court rejected that argument for two reasons. *First*, the plaintiff's husband had testified that the puddle "had like little track tires . . . probably from a grocery cart." *Id.* at *4. *Second*, the plaintiff testified that "there were Target employees stocking shelves in the area, and that she believed they should have seen the bleach puddle." *Ibid.* According to the court, "Plaintiff's and [her husband's] deposition testimony regarding track marks in the bleach puddle and the presence of Target employees who could have seen the

puddle is sufficient to raise an issue of fact for the jury." *Id.* at *5. Our case is similar. *First*, Diego and

her friend testified that the substance was "sticky"—thus raising a genuine question as to whether it

had been on the floor long enough for the liquid to evaporate, leaving behind the sugary stickiness

Diego says she fell on. *Second*, MSC's Standard Procedures Manual required "housekeeping personnel"

to be "permanently present" in or near the elevator lobby—thus creating a genuine question as to

whether, if a member of the housekeeping team *was* there, he (or she) should have noticed the spill in

the time it took for it to go from wet to sticky. Like the plaintiff in *Castellanos*, therefore, Diego has

created a genuine issue of material fact as to whether MSC had constructive knowledge of the presence

of the sticky substance.[15]

***

While cruise lines "are not general insurers of their" passengers, *Guevara*, 920 F.3d at 726–27

(Sutton, J., sitting by designation & concurring in part), they still bear certain obligations towards them.

In our case, there's more than enough evidence for a reasonable jury to find (1) that a sticky substance

was on the floor and (2) that MSC knew or should've known about it. To the extent MSC is right—

that there remain here certain unresolved, but important, factual disputes—we think it beyond cavil

that the task of resolving those disputes rests squarely with a jury of laymen (and women), not a panel

of (unelected) judges. *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343–44 (1979) (Rehnquist, J.,

dissenting) ("Trial by a jury of laymen rather than by the sovereign's judges was important to the

founders because juries represent the layman's common sense, the 'passional elements in our nature,'

---

[15] MSC separately asks for summary judgment because Diego "lacks the evidentiary support necessary to demonstrate the existence of any substantially similar prior incidents." MSJ at 12. But prior incidents are just *one way* in which a plaintiff in a slip-and-fall case can show constructive knowledge. *See Guevara*, 920 F.3d at 720 (explaining that a plaintiff can establish constructive knowledge *either* with evidence that the "defective condition exist[ed] for a sufficient period of time to invite corrective measures" *or* "with evidence of substantially similar" prior incidents (cleaned up)); *Torres*, 555 F. Supp. at 1283 (same). Because a reasonable jury *could* find that MSC either knew or should've known of the dangerous condition, Diego's failure to produce evidence of prior (similar) accidents is just irrelevant.

21

and thus keep the administration of law in accord with the wishes and feelings of the community."

(quoting OLIVER WENDELL HOLMES, COLLECTED LEGAL PAPERS 237 (1920))).

After careful review, therefore, we **ORDER and ADJUDGE** that MSC's Motion for Summary Judgment [ECF No. 49] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on June 6, 2024.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record